IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

NO. 7:16-CV-395-FL

| | | |
|---|---|---|
| WENDY GALE BRILEY, formerly known as Wendy Webb, | ) ) ) | |
| Plaintiff, | ) ) | ORDER |
| v. | ) ) | |
| BRUNSWICK COVE LIVING CENTER, LLC and RONALD ROSS, | ) ) ) | |
| Defendants.[1] | ) | |

This matter comes before the court on motion for summary judgment (DE 24) filed by defendant Brunswick Cove Living Center, LLC ("defendant").[2] Plaintiff responded and defendant replied. In this posture, the issues raised are ripe for ruling. For the following reasons, the motion is granted.

## STATEMENT OF THE CASE

Plaintiff commenced this employment discrimination action with a verified complaint filed on November 23, 2016, against defendant, her former employer, which is a nursing home and

---

[1] The caption of this order constructively has been amended to reflect the dismissal of formerly-named defendant Hedgehog Healthcare Associates, LLC, by stipulation of dismissal entered February 3, 2017.

[2] Where the clerk entered default against defendant Ronald Ross on February 22, 2017, all references to "defendant" herein refer to defendant Brunswick Cove Living Center, LLC, unless otherwise noted.

assisted living facility located in Winnabow, North Carolina, (the "facility"); and defendant Ronald Ross ("Ross"), who also is a former employee of defendant, asserting the following claims:[3]

1)   Violation by defendant of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 et seq., due to discrimination based upon sex, hostile work environment, and retaliation (Third Cause of Action).

2)   Common law intentional and negligent infliction of emotional distress (First and Second Causes of Action).

3)   Wrongful discharge by defendant in violation of North Carolina public policy (Fourth Cause of Action).

4)   Negligent supervision and retention by defendant (Fifth Cause of Action).

5)   Assault (Sixth Cause of Action).

6)   Invasion of privacy - offensive intrusion (Seventh Cause of Action).

Plaintiff seeks compensatory and punitive damages in excess of $25,000.00, as well as attorney's fees and costs. Defendant answered, and the clerk entered default against defendant Ronald Ross. In the meantime, the court entered case management order providing for close of discovery on August 22, 2017, and deadline for dispositive motions on September 22, 2017.

Defendant timely filed the instant motion, accompanied by a memorandum in support with exhibits. In particular, defendant relies upon the following materials in support of its motion:

1)   Plaintiff's deposition.

2)   A handwritten note of defendant Ross.

3)   Plaintiff's charge of discrimination.

---

[3] As noted, formerly-named defendant Hedgehog Healthcare Associates, LLC was dismissed by stipulation, and is not included in the above description of claims.

4)    Affidavit of Zachary Miller ("Miller"), administrator of the facility.

5)    Affidavit of Alice Dale, RN ("Dale"), director of nurses at the facility.

6)    Exhibits marked during plaintiff's deposition, including defendant's employee manual, Equal Employment Opportunity Commission ("EEOC") filings; defendant's sexual harassment/discrimination policy; and weekend manager job duties.

7)    Plaintiff's time card reports, signed policies, and defendant's time clock process.

8)    Resignation letter of defendant Ross.

9)    Plaintiff's medical records.

10)   Defendant's responses to interrogatories and requests for production of documents.[4]

In opposition, plaintiff relies upon a brief, statement of material facts, defendant's interrogatory responses, statements made in defendant's brief, and an affidavit by plaintiff. In reply, defendant relies upon exhibits previously cited, as well as an additional medical record.[5]

## STATEMENT OF FACTS

The facts viewed in the light most favorable to plaintiff may be summarized as follows. Plaintiff was employed by defendant from April 2013 until her termination on April 25, 2014. (Pl's Aff. (DE 26-3) ¶1; Verified Compl. ¶ 7). Plaintiff started as a cook assistant and then became a certified nursing assistant at the facility. (Verified Compl. ¶ 8). Individuals "with the authority to

---

[4] Defendant did not file a separate statement of material facts, as required by Local Rule 56.1(a). Defendant instead includes within its brief a statement of facts referencing the exhibits attached to its brief. Where the court did not notice previously this deficiency in defendant's brief, and where plaintiff did not object thereto, the court excuses compliance with this requirement in Local Rule 56.1(a), under the circumstances of this case.

[5] Upon completion of briefing, the court noticed deficiencies as to identification of exhibits and inclusion of information subject to privacy protection, noting waiver of such privacy protections pursuant to Federal Rule of Civil Procedure 5.2, in the event no motion to seal the same is filed. No such motion to seal has been filed.

hire, fire or discipline" plaintiff were Miller and the "Director of Nurses," Alice Dale ("Dale"). (Miller Aff. (DE 25-10) ¶ 23; Dale Aff. (DE 25-11) at ¶¶ 15-17).

Defendant Ronald Ross ("Ross") was hired as defendant's maintenance supervisor and maintenance department head December 14, 2012. (Org. Chart (DE 25-10) at 6).[6] He did not have any "authority to give [plaintiff] assignments and could not hire, fire, [or] discipline [plaintiff] or any other employee assigned to the Nursing Department." (Miller Aff. (DE 25-10) ¶ 23; Dale Aff. (DE 25-11) at ¶¶ 15-17). Ross submitted a letter of resignation on February 10, 2014, giving notice that he would work until March 28, 2014. (Defendant's Interrog. Resp. (DE 26-4) at 10).

On February 10, 2014, defendant Ross approached plaintiff and asked her name, and plaintiff stated her name was Wendy and turned and walked away. (Pl's Dep. (DE 25-2) at 20). The next day, on February 11, 2014, defendant Ross hand delivered a note to plaintiff as follows:



---

[6] Page numbers in citations to record documents (with a corresponding docket entry "DE" number indicated) reference the page number specified in the court's electronic case filing system and not the page number showing on the face of the underlying document, if any.

(Pl's Aff. Ex. 1 (DE 26-3) at 5-6 ; <u>see</u> Pl's Dep. (DE 25-2) at 20)). Plaintiff did not read the note until the end of her shift that day. (Pl's Dep. (DE 25-2) at 21-22). Plaintiff worked the next day without incident. (Pl's Dep. (DE 25-5) at 9; Time Card Report (DE 25-13) at 3).

On Thursday, February 13, 2014, on a day when plaintiff was off and not working, plaintiff came into the office, and described the note to a co-worker, Elizabeth Rothenberger ("Rothenberger"), who told plaintiff she needed to see Dale. (Pl's Dep. (DE 25-5) at 9-10). Rothenberger then walked plaintiff to Dale's office. (<u>Id.</u>)

Rothenberger stayed briefly with plaintiff in Dale's office, then Rothenberger left and plaintiff and Dale had a conversation about the note. (Pl's Dep. (DE 25-5) at 11). Dale said that defendant's head administrator, Zachary Miller ("Miller") "was out of the office that day or out of the facility that day, that she would bring it to his attention and let [plaintiff] know from there." (Pl's Dep. (DE 25-5) at 11). Miller was out of the office from February 13, 2014 through February 16, 2014, returning Monday, February 17, 2014. (Miller Aff. (DE 25-10) ¶ 3). Dale "did not realize that [defendant] Ross would be making rounds the upcoming weekend," at which time plaintiff was scheduled to be working at the facility. (Dale Aff. (DE 25-11) ¶¶ 8, 10). Defendant Ross was on a "rotat[ion]" that weekend "to provide supervisor coverage at the facility," (Pl's Aff. ¶ 11), and Martha Kahn ("Kahn") was the weekend nursing supervisor. (Defs' Interrog. Resp. (DE 26-4) at 5, 12).

Plaintiff reported for work on the weekend of February 15-16, 2014. During their regular work shift that weekend, plaintiff and another employee took a belt to defendant Ross for repairs, and defendant Ross made "hand actions . . . like he was having sex with the belt." (Pl's Dep. (DE 25-2) at 29). Defendant Ross also "pretend[ed] to be grabbing himself" multiple times during the

5

weekend. (Id.). While working that weekend, plaintiff and Ross had an encounter in a patient's room, "[w]hile [plaintiff] was providing patient care in an incoherent patient's room," in that "Ross entered the room, closed the door, and stated to [plaintiff] that as a supervisor she [sic] needed to speak with him [sic]." (Verified Compl. ¶ 23; see Pl's Dep. (DE 25-3) at 7-8). "Based on Ross' position as a Maintenance Supervisor and a Department Head [plaintiff] felt compelled to answer to him and viewed [him] as a supervisor and a superior." (Pl's Aff. (DE 26-3) ¶ 10).

At some point that weekend, plaintiff "had a conversation with" defendant Ross, during which "[h]e apologized for giving [plaintiff] the [note]." (Pl's Dep. (DE 25-3) at 9-10; see Miller Aff. Ex. A (DE 25-10) at 4). In addition:

> After several attempts [by plaintiff] at avoiding and ignoring Ross he continued to approach [plaintiff] during her shift. Each time [plaintiff] ignored him and [she] would immediately walk to an area with other employees present. Finally, as [plaintiff] was in the dining room Ross walked into the room and remained by the door with his arms crossed and impeded plaintiff's ability to get through that door. From then on, [plaintiff] did everything in her power to avoid contact with Ross and went the opposite direction each and every time she saw him.

(Verified Compl. ¶ 23; see Pl's Dep (DE 25-2) at 37-38; Pl's Dep. (DE 25-3) at 8-9; see Miller Aff. Ex. A (DE 25-10) at 4).

On Monday, February 17, 2014, Rothenberger and Dale spoke with Miller, and provided Miller with the note. (Miller Aff. (DE 25-10) ¶¶ 4-5). Miller "immediately called [defendant] Ross to [his] office and confronted [him] with [plaintiff's] allegation that [defendant] Ross had given her the note." (Id. ¶7). Defendant Ross "did not deny the allegations and admitted that he wrote the note." (Id. ¶ 8; Pl's Statement of Facts (DE 26-1) ¶ 7). Ross requested to be allowed to resign on March 28, 2014, per his earlier letter of resignation that he had already submitted to Miller. (Miller Aff. (DE 26-1) at ¶¶ 10-11; Pl's Statement of Facts (DE 26-1) ¶8). Miller "agreed to let [defendant]

Ross work out the remainder of his notice so long as there was no further misconduct on his part and so long as [plaintiff] did not object." (Miller Aff. (DE 26-1) at ¶12). Miller "instructed [defendant] Ross that in the interim, he was to stay away from [plaintiff]." (Id. ¶13).

Miller then met with plaintiff and Dale. (Id. ¶16). Plaintiff brought a statement to Miller describing defendant Ross's interactions with her, including defendant Ross's conduct over the weekend of February 15-16, 2014. (Id.; Miller Aff. Ex. A (DE 25-10) at 4-5). During that meeting, Miller referenced the note and "said he had discussed it with [Ross]." (Pl's Dep. (DE 25-3) at 5). Miller stated that defendant Ross did not "deny giving [plaintiff]" the note, and Miller stated that "he had to find out the legal way to terminate [defendant Ross], but he would be gone by the end of the week." (Id.). Miller asked plaintiff why she did not "simply 'kick [Ross] in the balls.'" (Verified Compl. ¶ 18).

Once during "[t]he week after [plaintiff] met with [Miller] and [Dale]," between February 17-21, 2014, defendant Ross made a "hand gesture" while passing plaintiff in the hall. (Pl's Dep. (DE 25-3) at 12-13). After February 21, 2014, defendant Ross did not have contact with plaintiff again and "did not have any supervisory authority over" plaintiff. (Pl's Dep. (DE 25-3) at 16). After February 21, 2014, Dale and Miller passed plaintiff in the hall and "put a thumbs up" to plaintiff to indicate whether "things were going okay" with plaintiff. (Pl's Dep. (DE 25-4) at 10). Plaintiff did not make any complaints to Miller, following February 17, 2014, "related to sexual harassment or any other inappropriate behavior on [defendant] Ross' part." (Miller Aff. (DE 25-10) ¶ 21; Dale Aff. (DE 25-11) ¶ 14).

On about February 24, 2014, plaintiff spoke with Hyla Peterson ("Peterson"), who "does . . . some HR functions for the nursing staff," who told plaintiff that defendant Ross was not going

to be terminated. (Pl's Dep. (DE 25-4) at 11-12). Defendant Ross stopped working for defendant on March 28, 2018. (Pl's Dep. (DE 25-4) at 8; Defendant's Interrog. Resp. (DE 26-4) at 10).

While plaintiff was in a restorative aide position, starting December 2013, Dale documented that plaintiff was absent January 10, 19, 21-24; February 3-4; April 3-7, 12-14, 16-21; and plaintiff came in early and left early on April 22-25, in violation of facility policy. (Dale Aff. (DE 25-11) at ¶¶ 29-34; <u>see</u> Archived Time Card Report (DE 25-13) at 1-8). Plaintiff had a physician note for her absence from April 12-14, and plaintiff had days off on April 5-6. (<u>Id.</u> ¶¶ 31-32). During March 2014, plaintiff was involved in a car accident while performing a work task on behalf of defendant. (Pl's Dep. (DE 25-3) at 19). According to Dale, when a "restorative aide is absent and cannot be replaced for a given day, it becomes difficult for Brunswick Cove to provide the mandated services which impacts both the residents' well-being and the facilities [sic] participation in Federal Health Care Programs." (Dale Aff. (DE 25-11) ¶¶ 28).

Dale warned plaintiff about her absences in January 2014. (<u>Id.</u> ¶ 29). Dale transferred plaintiff to a certified nurses aid position on April 25, 2014, explaining to plaintiff that the reason for her transfer was her frequent absences. (<u>Id.</u> ¶¶ 35-36; <u>see</u> Pl's Dep. (DE 25-3) at 21). Dale again verbally warned plaintiff about her absences. (<u>Id.</u> ¶¶ 37). After plaintiff was transferred, plaintiff "refus[ed] to give a resident a shower." (<u>Id.</u> ¶ 39). Dale asked plaintiff come to the facility to discuss these issues, as well as an allegation that plaintiff told other employees that she intended to post a mug shot of Dale online. (<u>Id.</u> ¶ 43).

Defendant terminated plaintiff on April 25, 2014. (Pl's Aff. (DE 26-3) ¶1; Verified Compl. ¶ 7).[7] According to defendant, "[i]t was the combination of the absences, her refusal to accept patient assignments and her malicious and false gossiping and her refusal to come into the facility to discuss these matters with Ms. Dale that led to the decision to terminate [plaintiff's] employment." (Def's Interrog. Resp. (D 26-4) at 13). Upon plaintiff's termination, Dale told plaintiff the reason for the termination was plaintiff's "absences and that [she] was spreading rumors." (Pl's Dep. (DE 25-4) at 3, 8).

## COURT'S DISCUSSION

A.    Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (internal quotation omitted). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry

---

[7] There is a discrepancy, including within plaintiff's evidence, whether plaintiff's termination date was April 25 or April 26, 2014. (Cf. Verified Compl. ¶ 7 ("April 25"); Pl's Aff. (DE 26-3) ¶1 (same); with Pl's Dep. (DE 25-4) at 8 ("April 26"); Dale Aff. (DE 25-11) ¶ 43 (same)). It is reasonable to infer that April 25, 2014, was the last day plaintiff was on the job at the facility, and April 26, 2014, was the date that plaintiff was terminated. (See Pl's Dep. (DE 25-4) at 3, 8; Dale Aff. (DE 25-11) ¶ 43). Nevertheless, this discrepancy is not determinative to the court's decision herein, and the court specifies April 25, 2014, as the date of termination for purposes of the instant factual summary.

of summary judgment.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party).

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249.  In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982) (quotations omitted).  Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture."  Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005).  By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied.  Id. at 489-90.

B.    Analysis

1.    Title VII

a.    Hostile Work Environment

Title VII prohibits employers from "discriminat[ing] against any individual with respect to . . . compensation, terms, conditions, or privileges of employment because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1).  "Because an employee's work environment is a term or condition of employment, Title VII creates a hostile working environment cause of action." Crockett v. Mission Hosp., Inc., 717 F.3d 348, 354 (4th Cir. 2013) (quotations omitted).  "To establish a hostile work environment based on sexual harassment under this provision, a plaintiff-employee must prove that (1) the conduct was unwelcome; (2) it was based on the plaintiff's sex; (3) it was sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) it was imputable on some factual basis to the employer." Id.

Defendant contends plaintiff has failed to bring forward sufficient evidence to establish the third and fourth elements of a hostile work environment claim.  The court addresses each element in turn below.

i.    Severe or Pervasive

This element is "judged by both an objective and subjective standard: [t]he conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive." Conner v. Schrader-Bridgeport Int'l, Inc., 227 F.3d 179, 193 (4th Cir. 2000).  The court "must look at all the circumstances to determine whether a work environment is hostile or abusive, including: (1) the

frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; (4) whether the conduct unreasonably interfered with the plaintiff's work performance; and (5) what psychological harm, if any, resulted." Id. In assessing the severity of the harassing conduct, the court is also "obliged to consider how [the harrasser] portrayed [his] authority and what [plaintiff] thus reasonably believed [the harrasser's] power to be." Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 279 (4th Cir. 2015) (en banc).

"[O]ffhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998). "These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code." Id. (quotations omitted). "Properly applied, they will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." Id. (quotations omitted). "[C]onduct must be extreme to amount to a change in the terms and conditions of employment, and the Courts of Appeals have heeded this view." Id.

In this case, plaintiff has not demonstrated the offensive conduct by defendant Ross was sufficiently severe or pervasive to alter her conditions of employment. Considering frequency and severity, although the note by defendant Ross is lewd and shocking in its content, it is a single written "offensive utterance." Conner, 227 F.3d at 193. Defendant Ross did not repeat or restate the offensive language in the note in verbal communication with plaintiff while at the facility. (See Pl's Dep. (DE 25-2) at 20-24). In addition, offensive hand gestures by defendant Ross, including simulated sex with a belt, took place in a limited time period in the course of one weekend shift, with one hand gesture the following week. (Pl's Dep. (DE 25-2) at 29; Pl's Dep. (DE 25-3) at 12-13).

Furthermore, additional harassing conduct by defendant Ross was not of a sexual nature. While rude and demeaning, defendant Ross's conduct in approaching plaintiff in an incapacitated patient's room, demanding to speak with her, blocking a doorway, and attempting an apology, were not accompanied by sexually inappropriate comments, gestures, or physical contact. (Verified Compl. ¶ 23; Pl's Dep. (DE 25-3) at 7-10, (DE 25-2) at 37-38; Miller Aff. Ex. A (DE 25-10) at 4). The court recognizes that the severity of this inappropriate conduct is augmented by plaintiff's perception that defendant Ross was in a managerial position during the weekend of February 15-16, 2014. (Pl's Aff. (DE 26-3) ¶ 10). However, defendant Ross did not threaten to take any adverse employment action against plaintiff, (see Pl's Dep. (DE 25-3) at 7-8), nor could he have done so, as discussed further below in the next section of this order.

The court next considers factors of interference with work functions and psychological harm. Plaintiff has not offered evidence tending to show interference with work functions or psychological harm resulting from the harassing conduct by defendant Ross. Plaintiff testified that she was able to complete her responsibilities at work. (Pl's Dep. (DE 25-4) at 17). In addition, medical records during the time period of her employment reflect medical and emotional issues attributed to a death in her family and financial difficulties, but there is no comment on workplace harassment or stresses. (See, e.g., April 14, 2014, Office Visit (DE 27-1) at 1 (reporting "increased stress lately with a recent family death"); Aug. 6, 2014, Office Visit (DE 25-22) at 1 (reporting "very stressed – she is having $ issues and mostly has been having family stress")).

In light of the absence of evidence bearing on work functions and psychological harm, considered together with a balance of remaining factors under all the circumstances of this case, plaintiff has failed to demonstrate a genuine issue of material fact that offensive conduct by

defendant Ross was sufficiently severe or pervasive to alter her conditions of employment. Accordingly, the court must award summary judgment to defendant on plaintiff's hostile work environment claim.

ii.      Imputable to Employer

In addition, and in the alternative, plaintiff has not demonstrated a genuine issue of material fact that the offensive conduct of defendant Ross was imputable to her employer, defendant.

"Under Title VII, an employer's liability for [workplace] harassment may depend on the status of the harasser." Vance v. Ball State Univ., 570 U.S. 421, 424 (2013). "If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions." Id. By contrast, if the "harasser is a 'supervisor,'" an employer may be strictly liable for any tangible employment action, or it otherwise may escape liability only by establishing an "affirmative defense" based upon prevention of harassing behavior and plaintiff's "fail[ure] to take advantage of the preventive or corrective opportunities that the employer provided." Id.

As a preliminary matter, plaintiff has not established a genuine issue of material fact that defendant Ross was her "supervisor." Id. The standard for qualification as a "supervisor," for purposes of this rule is strict. "[A]n employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim." Id. (emphasis added). Tangible employment actions comprise "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Id. at 424. In setting this standard, the Supreme Court rejected a previously used "nebulous definition

of a 'supervisor' . . . which tie[d] supervisor status to the ability to exercise significant direction over another's daily work."  Id. at 431 (quotations omitted).

Here, plaintiff has brought forward no evidence tending to show that defendant Ross had any authority to "take tangible employment actions against" plaintiff.  Id. at 424.  Defendant's evidence is uncontroverted that defendant Ross did not have any "authority to give [plaintiff] assignments and could not hire, fire, [or] discipline [plaintiff] or any other employee assigned to the Nursing Department."  (Miller Aff. (DE 25-10) ¶ 23; Dale Aff. (DE 25-11) at ¶¶ 15-17).  It is also uncontroverted that individuals "with the authority to hire, fire or discipline" plaintiff were Miller and Dale.  (Miller Aff. (DE 25-10) ¶ 23; Dale Aff. (DE 25-11) at ¶¶ 15-17). Plaintiff's suggestion that defendant Ross's status as a department head, self-described status as a supervisor, or weekend managerial duties, transform defendant Ross into a supervisor for purposes of vicarious liability are unavailing.  Given the clear delineation of departments at the facility (see Org. Chart (DE 25-10) at 6), as well as separate supervision in the nursing department, (see Miller Aff. (DE 25-10) ¶ 23; Dale Aff. (DE 25-11) at ¶¶ 15-17; Pl's Dep (DE 25-2) at 34), there is no basis to infer reasonably that defendant Ross was plaintiff's "supervisor" for purposes of Title VII vicarious liability. Vance, 570 U.S. at 424.

Accordingly, where defendant Ross was not plaintiff's supervisor for purposes of Title VII vicarious liability, the issue remains whether defendant was "negligent in controlling working conditions." Id. "Where an employee has been harassed by a coworker, the employer may be liable in negligence under the fourth element if it knew or should have known about the harassment and failed to take effective action to stop it." E.E.O.C. v. Xerxes Corp., 639 F.3d 658, 669 (4th Cir.

2011) (quotations omitted). "Once the employer has notice, then it must respond with remedial action reasonably calculated to end the harassment." Id.

"There is no 'exhaustive list' or 'particular combination' of remedial measures or steps that an employer need employ to insulate itself from liability." Id. In determining whether an employer's response was "reasonably calculated to prevent future harassment and therefore adequate as a matter of law," courts consider a number of factors:

> [C]ourts consider the timeliness of the plaintiff's complaint, whether the employer unduly delayed, and whether the response was proportional to the seriousness and frequency of the harassment. By way of example, responses that have been held reasonable have often included prompt investigation of the allegations, proactive solicitation of complaints, scheduling changes and transfers, oral or written warnings to refrain from harassing conduct, reprimands, and warnings that future misconduct could result in progressive discipline, including suspension and termination.
>
> The employer is, of course, obliged to respond to any repeat conduct; and whether the next employer response is reasonable may very well depend upon whether the employer progressively stiffens its discipline, or vainly hopes that no response, or the same response as before, will be effective. Repeat conduct may show the unreasonableness of prior responses. On the other hand, an employer is not liable, although harassment persists, so long as each response was reasonable. It follows that an employer is not required to terminate a [particular] perpetrator except where termination is the only response that would be reasonably calculated to end the harassment.

Id. at 670 (quotation omitted).

The court considers for negligence each level of response by defendant: 1) defendant's response to plaintiff's report of the note to Dale and to Miller; and 2) defendant's response to plaintiff's report of additional harassment over the weekend of February 15-16, 2014. Defendant's response to each report, separately and as a whole, reasonably was calculated to end the harassment.

As an initial matter, plaintiff did not report the note immediately upon discovering it after her shift on February 11, but rather returned to work for one day without incident February 12, and then came in to the office to report it on her next day off, February 13. Dale responded by receiving

16

plaintiff and Rothenberger in her office, and then discussing the note with plaintiff. (Pl's Dep. (DE 25-5) at 11). Although the contents of that discussion are in dispute, viewing the facts in the light most favorable to plaintiff, Dale stated to plaintiff solely that Dale would bring the note to Miller's attention when he returned to the office on Monday, February 17, 2014. (See id.).

Defendant's response at that time, through Dale, was reasonable. The need for urgent corrective action at that time was tempered by the fact that plaintiff herself delayed over one work day in reporting the note to Dale after discovering its contents; that this was the first report of sexual harassment on the part of defendant Ross; and that plaintiff did not at that time report any past or anticipated repetition of harassment by defendant Ross. In addition, because of the isolated nature of the incident, without a pattern of conduct, and because Dale "did not realize that [defendant] Ross would be making rounds the upcoming weekend," (Dale Aff. (DE 25-11) ¶¶ 8, 10), it was reasonable for Dale to await Miller's return for further action upon the note. Dale also was not in a position reasonably to confront defendant Ross at that time, where she was not in his department or his supervisor. (See Org. Chart (DE 25-10) at 6).

Defendant's next level of response to plaintiff's report of the note, after Dale provided Miller the note, also was reasonably calculated to end the harassment. At that time, Miller "immediately" confronted defendant Ross, and obtained defendant Ross's admission of misconduct. (Miller Aff. (DE 25-10) ¶7). Miller obtained Ross's agreement to resign so long as there was no further misconduct on his part and so long as [plaintiff] did not object." (Id. ¶12). Miller "instructed [defendant] Ross that in the interim, he was to stay away from [plaintiff]." (Id. ¶13). In light of the information known to Miller at that time, Miller's response at the time was reasonably calculated to end the harassment.

Defendant's response to plaintiff's second report of additional sexual harassment occurring over the weekend of February 15-16, 2014, effectively combined with its response to plaintiff's first report. Although defendant did not undertake any further or separate corrective action after plaintiff met with Miller on February 17, 2014, the corrective action already taken by Miller in response to the note, comprising confrontation with Ross, acceptance of his resignation, and directing him to "stay away" from plaintiff, was also reasonably calculated to end the harassment, in its additional form then reported. (Miller Aff. (DE 25-10) ¶¶ 7, 12-13).[8]

The court's determination regarding the effectiveness of defendant's response to plaintiff's last report of harassment is informed by several factors. First, after Miller confronted defendant Ross on February 17, 2014, plaintiff made no subsequent reports to defendant of harassment or misconduct on the part of defendant Ross. (Miller Aff. (DE 25-10) ¶ 21; Dale Aff. (DE 25-11) ¶ 14). After February 21, 2014, Dale and Miller passed plaintiff in the hall and "put a thumbs up" to plaintiff to indicate whether "things were going okay" with plaintiff. (Pl's Dep. (DE 25-4) at 10). Although defendant Ross made a "hand gesture" of unspecified nature while passing plaintiff in the hall sometime between February 17-21, (Pl's Dep. (DE 25-3) at 12-13), where plaintiff did not report this gesture and it was not of a sexual nature, it is reasonable to infer that the corrective action taken by defendant in response to plaintiff's reports of sexual harassment was, in fact, effective in stopping the sexual harassment. See Xerxes Corp., 639 F.3d at 670 ("A remedial action that effectively stops the harassment will be deemed adequate as a matter of law."). The impact of Miller's confrontation of Ross demonstrates that termination was not "the only response that would be reasonably calculated to end the harassment." Id.

---

[8] Miller's question to plaintiff on April 17, 2014, why she did not just "kick [Ross] in the balls," (Verified Compl. ¶ 18), while itself an improper response to plaintiff, does not undermine the efficacy of Miller's response and directions to defendant Ross, in confronting Ross and directing him to stay away from plaintiff.

In sum, plaintiff has not demonstrated a genuine issue of material fact that the offensive conduct of defendant Ross was imputable to her employer.   Therefore, defendant is entitled to summary judgment on plaintiff's Title VII claim for hostile work environment.

        b.     Retaliation

Plaintiff contends her termination was in retaliation for her complaints of sexual harassment. To establish a prima facie claim for retaliation under Title VII, a plaintiff must demonstrate that "she engaged in a protected activity"; 2) "her employer took an adverse action against her"; and 3) that "a casual link between the two events" existed. Boyer-Liberto, 786 F.3d at 281. "To prove a causal connection, [plaintiff] must be able to show that [defendant] fired [her] because the plaintiff engaged in a protected activity." Holland v. Washington Homes, Inc., 487 F.3d 208, 218 (4th Cir. 2007) (quotations omitted).

Generally, "temporal proximity between an employer's knowledge of protected activity and an adverse employment action" are not "sufficient evidence of causality to establish a prima facie case ... [unless] the temporal proximity [is] very close." Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273, (2001) (quotations omitted).  The Supreme Court did not establish a boundary of what constitutes "very close" in Clark County, but it did cite as examples of insufficient proximity two cases where adverse action was taken three months, and four months, respectively, after the protected activity. See id. at 273–74 (citing Richmond v. ONEOK, Inc., 120 F.3d 205, 209 (10th Cir.1997) Hughes v. Derwinski, 967 F.2d 1168, 1174–1175 (7th Cir.1992)).  In King v. Rumsfeld, 328 F.3d 145, 151 n. 5 (4th Cir.2003), the Fourth Circuit held that a ten week gap between protected activity and termination "weaken[ed] significantly" the inference of causation, but did not undercut that inference enough to render plaintiff's prima facie case unsuccessful.

In this case, similar to <u>King</u>, almost 10 weeks separated plaintiff's complaint of harassment and her termination. This temporal span is near the outer limit of what, alone, can establish a causal link between the protected activity and the adverse action. Plaintiff has not offered any additional evidence tending to show a causal connection between her complaint of harassment and her termination. Accordingly, plaintiff has not established a prima facie case of retaliation.

In addition, even assuming plaintiff has established a prima facie case, she has not established a genuine issue of fact of pretext to rebut defendant's legitimate non-discriminatory reasons for termination. "[F]ollowing the employer's proffer of a legitimate, non-retaliatory reason for an adverse employment action the burden of persuasion remains with the plaintiff to prove that the employer's reason is pretext, a cover-up for retaliation." <u>King</u>, 328 F.3d at 151. According to defendant, "[i]t was the combination of [plaintiff's] absences, her refusal to accept patient assignments and her malicious and false gossiping and her refusal to come into the facility to discuss these matters with Ms. Dale that led to the decision to terminate [plaintiff's] employment." (Def's Interrog. Resp. (D 26-4) at 13). These are legitimate, non-retaliatory reasons for termination.

Plaintiff has not brought forth evidence to create a genuine issue of fact of pretext. "[W]hen an employer gives a legitimate, non-discriminatory reason for discharging the plaintiff, it is not [the court's] province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." <u>Hawkins v. Pepsi Co.</u>, 203 F.3d 274, 279 (4th Cir.2000) (quotations omitted). Here, plaintiff has not offered evidence tending to show that defendant's reasons for terminating plaintiff were not its honest reasons for doing so.

Plaintiff suggests that she had a justification for some of her absences. For example, plaintiff asserts that she missed time from work when she suffered injuries in a car accident in March 2014. Defendant, however, did not cite any absences in March 2014 as a basis for plaintiff's termination.

(Dale Aff. (DE 25-11) at ¶¶ 29-34; <u>see</u> Archived Time Card Report (DE 25-13) at 1-8). Plaintiff also asserts that she was excused for work for medical recovery from shingles and for the death of a family member. According to defendant, however, plaintiff had a physician note for her absence only from April 12-14 and permission for days off on April 5-6. (Dale Aff. (DE 25-11) at ¶¶ 31-32; <u>see</u> Archived Time Card Report (DE 25-13) at 7-8). Otherwise, plaintiff's absences were unexcused.

Even if defendant was incorrect in its assessment of plaintiff's absences, plaintiff has not brought forth evidence permitting an inference that defendant did not honestly believe plaintiff had unacceptable absences during the total time period between January and April, in light of contemporaneous time records and medical records. (<u>See</u> Archived Time Card Report (DE 25-13) at 7-8; April 14, 2014, office visit (DE 27-1) at 1-2). Plaintiff also offers no evidence to rebut defendant's evidence that Dale warned plaintiff about her absences in January and April, or to rebut defendant's evidence that Dale honestly believed that plaintiff had refused a work assignment and spread a rumor about Dale in the office. (Dale Aff. (DE 25-11) at ¶¶ 39, 41).

In sum, where plaintiff fails to establish a genuine issue of fact of causal connection and pretext, the court must grant summary judgment to defendant on plaintiff's retaliation claim.

2.      Intentional and Negligent Infliction of Emotional Distress

Under North Carolina law, to establish a prima facie case for intentional or negligent infliction of emotional distress, a plaintiff must set forth sufficient evidence to establish conduct by defendant that caused "severe emotional distress." <u>Waddle v. Sparks,</u> 331 N.C. 73, 82 (1992); <u>Johnson v. Ruark Obstetrics & Gynecology Assocs., P.A.,</u> 327 N.C. 283, 304 (1990). "The law interferes only where the distress inflicted is so severe that no reasonable man could be expected to endure it." <u>Waddle,</u> 331 N.C. at 84. "In this context, the term 'severe emotional distress' means any emotional or mental disorder, such as, for example, neurosis, psychosis, chronic depression, phobia,

or any other type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so."  Johnson, 327 N.C. at 304.

Here, plaintiff has not established a genuine issue of fact that defendant Ross's conduct caused her "severe emotional distress."  As noted previously, plaintiff has not offered evidence tending to show psychological harm resulting from the harassing conduct by defendant Ross. Plaintiff testified that she was able to complete her responsibilities at work.  (Pl's Dep. (DE 25-4) at 17).  In addition, medical records during the time period of her employment reflect medical and emotional issues attributed to a death in her family and financial difficulties, but there is no comment on workplace harassment or stresses.  (See, e.g., April 14, 2014, Office Visit (DE 27-1) at 1 (reporting "increased stress lately with a recent family death"); Aug. 6, 2014, Office Visit (DE 25-22) at 1 (reporting "very stressed – she is having $ issues and mostly has been having family stress")).

In sum, plaintiff has failed to establish a genuine issue of fact on her claims of intentional and negligent infliction of emotional distress.  Therefore, the court must grant summary judgment to defendant on these claims.

  3.  Wrongful Discharge

Plaintiff asserts that she was wrongfully terminated in retaliation for her complaint of sexual harassment, in violation of public policy declarations contained in North Carolina General Statute § 143-422.2.  That statute states that it is the public policy of North Carolina to safeguard "employment without discrimination or abridgement on account of race, religion, color, national origin, age, sex or handicap."  However, plaintiff has failed to establish a genuine issue of fact as to discriminatory retaliation, for the reasons set forth above with respect to plaintiff's Title VII claim.  Accordingly, the court must grant summary judgment to defendant on this claim.

4.        Negligent Supervision and Retention

Plaintiff asserts that defendant negligently supervised and retained defendant Ross after her

complaint of sexual harassment.  "North Carolina recognizes a claim for negligent employment or

retention when the plaintiff proves" the following elements:

> (1) the specific negligent act on which the action is founded ... (2) incompetency, by
> inherent unfitness or previous specific acts of negligence, from which incompetency
> may be inferred; and (3) either actual notice to the master of such unfitness or bad
> habits, or constructive notice, by showing that the master could have known the facts
> had he used ordinary care in oversight and supervision, ...; and (4) that the injury
> complained of resulted from the incompetency proved.

Medlin v. Bass, 327 N.C. 587, 590–91 (1990) (quoting Walters v. Lumber Co., 163 N.C. 536, 541

(1913)). In addition, "An essential element of a claim for negligent retention of an employee is that

the employee committed a tortious act resulting in plaintiffs' injuries." Waddle v. Sparks, 331 N.C.

73, 87 (1992).

Plaintiff's negligent supervision and retention claim fails because there is no genuine issue

of fact that Miller, who had authority to supervise and retain defendant Ross, did not know or have

reason to know of Ross's sexual harassment or proclivity to sexually harass before February 17,

2014, the date Miller confronted Ross. (Miller Aff. (DE 25-10) ¶¶ 3, 10-11, 14, 20-21).  At that

point, as discussed above with respect to plaintiff's Title VII claim, Miller used ordinary care in

oversight and supervision of defendant Ross. (Miller Aff. (DE 25-10) ¶¶ 7, 12-13). In addition,

plaintiff has not demonstrated injury resulting from defendant Ross's conduct after Miller

confronted Ross.   (See  Pl's Dep. (DE 25-3) at 12-13; Pl's Dep. (DE 25-4) at 10).

Therefore, the court must grant summary judgment to defendant on this claim.

5.      Assault and Invasion of Privacy

Plaintiff asserts that defendant is liable for assault by defendant Ross, where he acted "in a manner that threatened [plaintiff] with imminent bodily injury through is actions and verbal and nonverbal language communicated to [plaintiff]." (Verified Compl. ¶ 73). Plaintiff also asserts that defendant Ross "intruded upon [plaintiff's] solitude, seclusion, private affairs and personal concerns in a physical and/or mental manner." (Id. ¶ 82).

In the context of liability upon an employer for intentional torts of an employee, "[a] principal is liable for the torts of his agent (1) when expressly authorized; (2) when committed within the scope of his employment and in furtherance of his master's business-when the act comes within his implied authority; [or] (3) when ratified by the principal." Snow v. De Butts, 212 N.C. 120, 193 S.E. 224, 226 (1937). Here plaintiff asserts that defendant ratified Ross's conduct "through [its] failure to reprimand him or take timely action in order to prevent him from engaging in such conduct." (Verified Compl. ¶¶ 77, 86). In order to show that a employer ratified the tortious act of an employee, a plaintiff must show that the employer had knowledge of "all material facts and circumstances relative to the wrongful act, and that the employer, by words or conduct, shows an intention to ratify the act." Brown v. Burlington Indus., Inc., 93 N.C. 431, 437 (1989); see Hogan v. Forsyth Country Club Co., 79 N.C. App. 483, 492 (1986).

Here, plaintiff has not forecasted evidence that, once defendant, through reports to Miller, had knowledge of all material facts of defendant Ross's assaultive conduct, it ratified such conduct. To the contrary, Miller took action counter to this conduct by confronting Ross, accepting his resignation, and instructing him to "stay away" from plaintiff. (Miller Aff. (DE 25-10) ¶¶ 7, 12-13). Accordingly, the court must grant summary judgment to defendant on these tort claims.

6.    Claims Against Defendant Ross

Given the court's basis for summary judgment in favor of defendant on plaintiff's claims for intentional and negligent infliction of emotional distress, it is also appropriate to consider summary judgment on the same claims against defendant Ross, even though he is in default.  See Fed. R. Civ. P. 56(f)(1) (stating that the court may "grant summary judgment for a nonmovant"); U. S. for Use of Hudson v. Peerless Ins. Co., 374 F.2d 942, 945 (4th Cir. 1967) ("Where the liability is joint and several or closely interrelated and a defending party establishes that plaintiff has no cause of action or present right of recovery, this defense generally inures also to the benefit of a defaulting defendant").  Accordingly, within 21 days of the date of this order, plaintiff is DIRECTED to show cause, if any, why summary judgment should not be entered against plaintiff on plaintiff's claims of intentional and negligent infliction of emotional distress against defendant Ross, on the basis of the court's analysis herein.  In the event plaintiff does not respond, the clerk is DIRECTED, without further order of the court, to enter summary judgment in favor of defendant Ross on plaintiff's claims of intentional and negligent infliction of emotional distress.

By contrast, the court's basis for granting summary judgment to defendant on plaintiff's tort claims for assault and invasion of privacy is inapplicable to plaintiff's claims directly against defendant Ross.  Accordingly, such claims remain pending against defendant Ross, who is in default. Plaintiff is DIRECTED to file a motion to reduce such claims to judgment, if any, within 21 days of the date of this order.

**CONCLUSION**

Based on the foregoing, defendant's motion for summary judgment (DE 24) is GRANTED. Where plaintiff's claims against defaulting defendant Ross remain, within **21 days** of the date of this order, plaintiff is  DIRECTED to show cause, if any, why summary judgment should not be entered

in favor of defendant Ross on plaintiff's claims of intentional and negligent infliction of emotional distress, on the basis of the court's analysis herein. In the event plaintiff does not respond, the clerk is DIRECTED, without further order of the court, to enter summary judgment in favor of defendant Ross on plaintiff's claims of intentional and negligent infliction of emotional distress. With respect to plaintiff's claims of assault and invasion of privacy remaining against defendant Ross, plaintiff is DIRECTED to file a motion to reduce such claims to judgment, if any, within **21 days** of the date of this order.

SO ORDERED, this the 16th day of May, 2018.


LOUISE W. FLANAGAN
United States District Judge